1

2

3

4

5

6

7

8           **IN THE UNITED STATES DISTRICT COURT**

9           **FOR THE EASTERN DISTRICT OF CALIFORNIA**

10

11  JIMMIE LEON MARTIN,                    No. CIV S-09-1017-CMK

12              Plaintiff,

13      vs.                                <u>MEMORANDUM OPINION AND ORDER</u>

14  COMMISSIONER OF SOCIAL
    SECURITY,

15              Defendant.

16  _____/

17

18          Plaintiff, who is proceeding with retained counsel, brings this action for judicial

19  review of a final decision of the Commissioner of Social Security under 42 U.S.C. § 405(g).

20  Pursuant to the written consent of all parties, this case is before the undersigned as the presiding

21  judge for all purposes, including entry of final judgment.  <u>See</u> 28 U.S.C. § 636(c).  Pending

22  before the court are plaintiff's motion for summary judgment (Doc. 21) and defendant's cross-

23  motion for summary judgment (Doc. 24).

24  / / /

25  / / /

26  / / /

# I.  PROCEDURAL HISTORY

Plaintiff applied for social security benefits on April 5, 2006.  In the application, plaintiff claims that disability began on July 14, 2002.  Plaintiff claims that disability is caused by a combination of "degenerative disc disease. . ., bilateral lumbosacral radiculopathy, lumbar facet atrophy, amyloidosis, and depression."  Plaintiff's claim was initially denied.  Following denial of reconsideration, plaintiff requested an administrative hearing, which was held on May 7, 2008, before Administrative Law Judge ("ALJ") William C. Thompson, Jr.   In a July 23, 2008, decision, the ALJ concluded that plaintiff is not disabled based on the following relevant findings:

> 1.  The claimant has the following severe impairment: degenerative disc disease of the lumbar spine;
>
> 2.  The claimant does not have an impairment or combination of impairments that meet or medically equal any impairment listed in the regulations;
>
> 3.  The claimant has the residual functional capacity to perform light work except he would be limited to occasional stooping, squatting, kneeling, crawling, and climbing, and no tasks involving the use of foot controls; and
>
> 4.  Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.

After the Appeals Council declined review on February 13, 2009, this appeal followed.

# II.  SUMMARY OF THE EVIDENCE

The certified administrative record ("CAR") contains the following evidence, summarized chronologically below:

July 16, 2002 – Treating chiropractor Timothy Brown, D.C., prepared a doctor's first report of injury relating to a work accident occurring earlier that day.[1]

---

[1]     Other records suggest the injury occurred on July 12, 2002, or July 14, 2002.

1        August 14, 2002 – A "Work Status Worksheet" prepared by an attending

2  physician at St. Joseph's Hospital indicates that plaintiff's work status was classified as "limited

3  duty" from August 14, 2002, through August 28, 2002.  The doctor opined that plaintiff should

4  not push/pull/lift more than 10 pounds and that he should avoid repetitive bending or stooping

5  and all kneeling and squatting.

6        November 12, 2002 – John H. Karan, M.D., reported on a neurologic evaluation

7  performed at the request of plaintiff's treating chiropractor.  Dr. Karan reported the following

8  history:

9            . . . As you know he is a 46-year-old Caucasian male who reports that he
             has no prior history of back pain, numbness, or tingling in the arms or legs
10           except for a history of amyloidosis of the skin.  Patient reports that he
             works as a tile setter and construction worker for Simar Flooring Company
11           in Lathrop, CA.  He reports that on August 16, 2002, he was tearing out a
             kitchen and removing an old sink and replacing it with a new sink when he
12           was bending down and lifting up the sink and felt a pop in his lower spine
             area. . . .[2]  Chiropractic therapy was initiated.  He reports that he tried
13           physical therapy, hot tub treatments at home.  He also reports that he has
             been getting chiropractic therapy three times a week with some
14           improvement in his symptoms.  He reports that he is still experiencing
             intermittent pain in his lower back.  Sometimes it is a constant discomfort
15           and he has difficulty sleeping.  Some days are worse than others are.  He is
             also experiencing numbness and weakness and tingling sensation and
16           shooting pain in the left leg.

17  On physical examination, Dr. Karan reported the following impressions:

18           Mr. James Martin appeared to have sustained a lower back injury as a
             result of this bending and placing of the sink as he was doing at his job on
19           July 16, 2002.  It appears that his symptoms are persisting with moderate
             to severe low-back pain intermittently.  He is also experiencing radicular
20           symptoms.  Apparently he had some x-ray studies done at St. Joseph
             Hospital.  The details of which are not available to me.  He has also been
21           receiving chiropractic therapy with significant relief. . . .

22  Dr. Karan recommended an MRI, medication, and additional chiropractic therapy.

23  / / /

24  / / /

25

26      [2]      Elsewhere in the report, the date of injury is listed as July 16, 2002.

3

1         <u>November 12, 2002</u> – Plaintiff completed a "Neurological Questionnaire." He

2    stated that, in light of his occupational injury, he could only lift up to 50 pounds whereas before

3    the accident he could lift up to 100 pounds.

4         <u>November 15, 2002</u> – Treating chiropractor Dr. Brown reported that plaintiff was

5    disabled due to "flare-ups to his low back when he attempts to perform activities such as lifting,

6    bending, twisting, and stooping." No objective findings were noted. The doctor opined that

7    plaintiff could return to his regular and customary work by December 20, 2002.

8         <u>November 25, 2002</u> – Plaintiff's treating chiropractor prepared a progress note

9    following an examination. Plaintiff complained of "frequent to constant moderate to severe low

10   back pain with intermittent bilateral buttock and left leg pain and numbness." Objectively, the

11   doctor noted decreased thoraco-lumbar range of motion with pain in flexion, as well as muscle

12   tightness and tenderness. The doctor also reported that Kemp's, Ely's, Yeoman's, and straight

13   leg raising tests were all positive. Chiropractic care was recommended. The doctor opined that

14   plaintiff should remain off work until January 6, 2003.

15        <u>December 3, 2002</u> – Plaintiff underwent diagnostic imaging of his left hip and

16   pelvis incident to complaints of left hip pain. The examiner noted the following findings:

17             In the left proximal femur I see no evidence of sclerotic areas. No linear
               lucencies. The femoral head is normal in contour. No joint space
18             narrowing. No osteophytes.

19   The doctor concluded there was no evidence of avascular necrosis.

20        <u>December 19, 2002</u> – Plaintiff underwent a lumbar MRI. The results showed:

21             Degenerative discs and facet joints at L4-5 and L5-S1, causing no central
               stenosis. The . . . L5 nerve roots are questionably compressed at the L4-5
22             subarticular lateral recesses. Slight L5-S1 foraminal narrowing.

23        <u>March 5, 2003</u> – Dr. Brown prepared a follow-up note after treatment. While

24   objective findings are noted, it is unclear whether those are based on a current examination or a

25   prior examination. The doctor did note recent EMG findings of February 25, 2003, provided by

26   Dr. Karan. Dr. Brown recommended that plaintiff remain off work until April 16, 2003.

June 11, 2003 – Dr. Brown prepared a follow-up progress note.  While objective findings are listed, it is not clear whether those reflect a current or prior examination.  The doctor opined that plaintiff should remain off work until July 25, 2003.  The doctor recommended continued conservative treatment consisting of chiropractic therapy.  No medication is indicated.

September 29, 2003 – Plaintiff completed a form entitled "Personal Injury Patient History" on which he reported involvement in an auto accident on September 26, 2003.  Plaintiff listed his employer as "BAC Local #3 Oakland" and stated that his occupation was "Bricklayer – Tilesetter."

November 14, 2003 – Dr. Brown submitted a letter to MasterPlan vocation rehabilitation services indicating that, in his opinion, plaintiff "can complete the duties and responsibilities as outlined in the job analysis for Home Inspector/Contractor."  This job involves occasional to frequent standing/walking, frequent sitting, occasional stooping/bending/crouching/crawling, occasional lifting/carrying up to 10 pounds, and occasional pushing/pulling.

January 20, 2004 – A new patient form prepared by staff at Central Valley Medical Care indicates that plaintiff presented with no acute complaints.

April 8, 2004 – Qualified medical examiner Robert B. Steiner, M.D., performed an orthopedic evaluation and submitted a report.  At that time, plaintiff's complaints were reported as follows:

> He continues to have daily pain in his low back but more pain in his legs, left greater pain than right and to the foot.  He gets a tingling sensation in the lateral aspect of the foot, and has cramping in the calf, particularly. His night cramps are a major issue, involving the calves and feet.

On physical examination, plaintiff was seen getting on and off the examination table without apparent difficulty.  Gait was normal, he could negotiate heels and toes, though heel walking on the left was somewhat difficult compared to the right.  Flexion of the spine was limited 50 %, and spine extension was 50% to 75% in the standing position.  Straight leg raising was positive at 70 degrees.  The doctor noted that plaintiff's back and leg pain were absent at rest and

1   increased to frequent and moderate with activity.  Dr. Steiner concluded that plaintiff could no

2   longer perform "substantial work" and could stand/walk four hours in an eight-hour day, and sit

3   for four to six hours in an eight-hour day.

4          July 13, 2004 – Qualified medical examiner Ronald B. Wolfson, M.D., examined

5   plaintiff and prepared a report.  On physical examination, ranges of motion of the back were 70%

6   to 80% of normal.  Ranges of motion of the ankles, hips, and knees were normal.  Straight leg

7   raising showed tightness in the hamstrings at 70 degrees.  Dr. Wolfson diagnosed back sprain

8   resulting from the July 2002 work accident, with "underlying degenerative arthritis at two levels,

9   4-5 and 5-1."  The doctor offered the following discussion:

10          Jimmy Martinez is a forty-eight year old, right hand dominant man, who I
             had previously seen for an AOE/COE evaluation on December 10, 2002.
11          At that time, I felt that there was industrial causation for his low back
             complaints.  The treatment he has had has been generally appropriate.  He
12          has had medication, he has had rest and he has had vocational
             rehabilitation and will not be returning to work as a tile setter.  The MRI
13          that was done showed that he had facet arthritis and degenerative disk
             disease at two levels, 4-5 and 5-1 and had EMG studies suggestive of
14          some mild radiculopathy, greater on the right than on the left.  His spine
             mobility has increased and there is less tenderness.

15

16   Dr. Wolfson opined that plaintiff "has a disability precluding very heavy work."

17          February 23, 2005 – Dr. Brown completed a doctor's certificate in connection

18   with plaintiff's claim for disability benefits.  On this form, Dr. Brown indicates that plaintiff's

19   disability began on June 25, 2004, due to lumbar neuralgia.  While objective findings, such as

20   decreased range of motion are noted, it is not clear whether these are findings observed at a

21   current or past evaluation.  Dr. Brown indicated that the course of treatment consists of

22   manipulative chiropractic treatment "when needed."  No medication is mentioned.

23          March 25, 2005 – Dr. Brown prepared a progress note on which he indicates that

24   plaintiff "is doing better both subjectively and objectively/functionally since his last evaluation

25   dated 02/04/2005."  On a pain questionnaire completed at the time of the follow-up evaluation,

26   plaintiff reported that his pain "comes and goes and is moderate."  He also reported that he could

1   manage his own dressing and washing without changing his routine due to pain.  He added that,

2   while he cannot lift "heavy weights" due to pain, he can list "light to medium weights."  Plaintiff

3   stated that he cannot walk for more than 1/4 mile or sit for more than one hour.  Plaintiff added

4   that his "pain seems to be getting better, but improvement is slow at present."

5           July 27, 2005 – Desmond Erasmus, M.D., reported on a neurological evaluation

6   requested by Dr. Brown.  Dr. Erasmus reported the following background:

7               . . . . [Plaintiff] came under your [Dr. Brown's] care and has been treated
            by you for an extensive duration.  After about 6 months, he was aware that
8           the severe back and left leg pain had eased to a significant extent.  Over
            the last 2-1/2 years, he is left with some degree of low back pain with
9           radiation into the gluteal area bilaterally.  He describes frequent back
            spasms and cramping of the legs bilaterally.  He describes a constant
10          sensation of tightness across the lumbosacral region with additional
            tightness in the posterior thigh and leg and intermittent numbness
11          involving the big toe bilaterally.  Symptoms were worse on the left side
            than on the right.  There has been no associated loss of urinary or bowel
12          control.

13              He finds himself unable to sit for too long or stand for too long or lie in
            one position for too long.
14

15  Dr. Erasmus noted that plaintiff's current medications consisted of Vicodin and Flexeril for pain.

16  On physical examination, Dr. Erasmus reported:

17              His examination reveals an alert and oriented gentleman who walks with a
            reasonably satisfactory gait.  He is able to heel and toe walk, but has a
18          slight weakness of dorsiflexion of the right foot involving the extensor
            hallucis.  The straight-leg raising test is negative to 70 degrees bilaterally
19          producing back pain.  He has brisk and symmetric active reflexes at the
            biceps, triceps, and knees.  The ankle reflexes are symmetrically
20          depressed.  Babinski responses are flexor.  Peripheral pulses are intact.
            There is no obvious atrophy of muscle groups in the calf and thigh on
21          observation.  We did not measure the circumference of the thigh and calf
            musculature.  There does not appear to be any focal paralysis of the upper
22          and lower extremities.

23  The doctor advised that plaintiff undergo a lumbar MRI.  Possible treatment options included

24  epidural injections, chronic pain management at a pain clinic, and the remote possibility of

25  surgery.

26  / / /

September 21, 2005 – Dr. Erasmus reported following review of recent MRI study data:

> . . . The test was performed on 08.25.05.  On personal review of his MRI study, I note that he has advanced degeneration of the L5-S1 disc with narrow foramina bilaterally.  This results in narrowing of the foramen through which the existing L5 nerve root travels.
>
> At L4-5, the MRI study shows a small posterior protrusion that measures less then 3 mm in size.  It tends to touch the thecal sac, but in my opinion does not cause any compression of the traversing L5 nerve root.
>
> Treatment options were discussed with Mr. Martin.  In summary, he does not require a microdiscectomy.  A minimally invasive surgical procedure will not bring about resolution of his lumbar radiculitis.

The doctor added: "If he were to choose surgery as an option, he would require a two-level instrumental spinal fusion at L4-5 and L5-S1."  The doctor concluded by opining that the narrow disc space at L5-S1 "results in intermittent L5 radicular irritation/compression resulting in his symptoms of back and leg pain."  Dr. Erasmus stated that plaintiff could "stay nonsurgical" by continuing a course of back stabilization treatment and exercise.

January 12, 2006 – Qualified medical examiner Robert Steiner, M.D., submitted a supplemental report.  The purpose of the supplement was to clarify the doctor's opinion regarding apportionment of causation of plaintiff's impairments.

January 31, 2006 – A progress note prepared by Dr. Brown indicates that plaintiff's care has consisted of chiropractic manipulation and "appropriate physio therapy."  Dr. Brown anticipated releasing plaintiff to return to his regular and customary work as of February 17, 2006.

March 22, 2006 – Dr. Erasmus reported following re-examination of plaintiff at Dr. Brown's request.  The doctor reported the following history:

> He continues to remain symptomatic with back pain radiating to both lower extremities and describes as the dysesthetic sensation along the L5 dermatome of his left more so than the right foot.  The sysethetic sensation is in the dorsum and the first webspace of the left foot more so than the right.  He has frequent episodes of a tendency for his left leg to give way

8

1     suddenly.

2  On physical examination, Dr. Erasmus reported that plaintiff remains essentially unchanged.

3          April 24, 2006 – Plaintiff submitted a "Function Report – Adult" outlining his

4  symptoms and limitations.  Plaintiff stated that he is "up at night not sleeping because of leg

5  spasms etc."  On a daily basis, he eats breakfast, does some exercises, light house work, and light

6  yard work "when up to it."  He stated: "For one day of activities, I have to rest the next day."  He

7  added that he has to "constantly change my position of movement to stop pain, cramping,

8  spasms."  He stated that he cares for the family cat with no help.  Plaintiff added that, due to

9  cramps and muscle spasms, he does not sleep through the night.  He stated that, because he has

10  no money or insurance, he cannot afford his medication and, therefore, does not need any

11  reminders to take medication he does not possess.  As to food preparation, he stated that he

12  prepares his own meals once or twice a day, but only "easy leftovers."  Regarding personal care,

13  plaintiff stated that he needs assistance bathing and dressing, but does not need assistance to care

14  for his hair, shave, or feed himself.  Plaintiff stated that he could do light house and yard work

15  "as pain & legs hold out."  He stated that he has fallen while doing such chores due to pain.  He

16  stated that he takes breaks and paces himself.  As to getting around and mobility, plaintiff stated:

17  "If legs & feet are bad, I don't go out at all."  When he does go out, he drives himself.  He stated

18  that he cannot go out alone because, sometimes, his legs "just give out."  He goes grocery

19  shopping with his wife once or twice a week for a half hour at a time.  Plaintiff stated that he is

20  able to pay bills and count change.  With respect to hobbies and interests, plaintiff stated:

21  "Everything has stopped, except trips to doctors, QME, lawyers, re-hab."  He added that he "gets

22  sick by being around groups of people or kids."  He also stated that he has lost faith in trusting

23  people.

24  / / /

25  / / /

26  / / /

Regarding physical abilities and limitations, plaintiff stated that his impairments affect the following functional areas: lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, hearing, stair-climbing, completing tasks, concentration, understanding, using his hands, and getting along with others.  The level of disability in these areas, according to plaintiff, depends on pain, cramping, and spasms.  As to how far he can walk without resting, plaintiff stated that he can "walk the store" but then he's "done for the day."  He added: "If I have a busy day, it takes the next day to recover."  He stated that he uses crutches, cane, braces, and/or a splint to move around.  Plaintiff stated that he follows written and spoken instructions "O.K."  He stated that he does not get along with authority figures or handle stress well.

April 24, 2006 – Plaintiff's wife, Paula Martin, submitted a "Function Report – Adult – Third Party" regarding her husband's impairments and symptoms.  She stated that plaintiff is "up several times a night" due to muscle spasms and cramps and that, in the morning, he gets up very slowly, "stretching to bring muscles out."  She added that he sometimes needs help to stand.  Mrs. Martin stated that plaintiff will do exercises "if he is able to do them."  She stated that she drives plaintiff to doctor appointments three times a week and that "the ride is very hard on him" because having his legs in the same position causes cramping."  Regarding a particular doctor who is some distance away from plaintiff's home, Mrs. Martin stated that the road trip was "rough" and added: "If he tries to do much more it wipes him out so bad he is unable to do anything but sleep [the] next day."  Mrs. Martin stated that plaintiff cares for the family dog but that she will take the dog to the vet when necessary.

As to personal care, Mrs. Martin stated that plaintiff has problems with his feet which require him to wear special shoes.  She added that he is unable to bend over or stand/walk for more than 15 minutes due to increasing pain.  She stated that plaintiff has fallen down many times.  Mrs. Martin stated that plaintiff is able to care for his hair, shave, and feed himself.  She stated that plaintiff needs reminders to take a bath and wash his hair.  She said he needs assistance in and out of the bathtub.  As to meals, Mrs. Martin stated that, while plaintiff prepares

his own meals, she has items available for him that "he can get and eat easily."  Mrs. Martin also

stated that plaintiff does "some light house work, light yard if legs hold out."  She added that

plaintiff has had several falls.  Plaintiff's wife stated that he can drive a car, but cannot go out

alone because he "falls too much."  She added that plaintiff goes shopping one to two times per

week for a half hour at a time.  Mrs. Martin stated that plaintiff is able to pay bills and count

change but that he does not handle savings or checking accounts due to "no cash flow."  As to

hobbies and interests, Mrs. Martin stated: "Almost everything has ended; takes too much time

and energy for him. . . ."  She added that plaintiff goes to church "maybe 3 times a year."

With respect to plaintiff's abilities, Mrs. Martin stated that plaintiff has difficulty

with lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, stair climbing, and

using his hands due to pain, cramping and weakness.  She stated that plaintiff requires use of

crutches, cane, and/or brace to move about.  She added that he has difficulty with memory,

completing tasks, concentration, and understanding due to being tired.  Mrs. Martin stated that

plaintiff can only walk for 20 feet before needing to rest.  She stated that plaintiff cannot pay

attention because he cannot focus.  She added that, due to this problem, he does not complete

tasks, gets frustrated easily, and would rather give up.  Mrs. Martin stated that plaintiff is unable

to get along with authority figures, but did not state why.  She added that plaintiff cannot handle

stress because he gets upset.  According to Mrs. Martin, plaintiff "does O.K." with changes in

routine, but that it takes him "forever to learn it."  Mrs. Martin stated that her husband is very

depressed and worried about their future given the lack of money.

August 5, 2006 – Agency examining doctor Steve McIntire, M.D., reported on a

comprehensive physical examination.  Dr. McIntire noted that plaintiff was in no acute distress

and did not use any assistive devices.  Dr. McIntire reported the following functional assessment:

> Objectively, there are no findings on the present examination of a lumbar
> radiculopathy or a myelopathy.  Apparently, nerve conduction studies have
> been positive in the past, however.  The claimant does have significant
> loss of range of motion of the lumbar spine and tenderness on palpation.
> He walks with a somewhat stiff posture.

1   
2   
3   
4   
5   

> Given the above findings, the claimant would have significant functional limitations.  He would be limited to not more than six hours of walking or standing in an eight-hour day.  He should not lift or carry more than 10 pounds frequently or 20 pounds occasionally.  He should not engage in activities requiring squatting, crawling, kneeling, climbing, or stooping.  The current examination does not suggest limitations in terms of time sitting.  There are no manipulative limitations suggested by the present examination.

6          <u>August 17, 2006</u> – Agency examining psychiatrist Bradley Daigle, M.D., reported

7   on a comprehensive psychiatric evaluation.  Dr. Daigle reported the following background:

8   
9   
10   
11   
12   
13   
14   
15   

> Psychologically, the last several years have been very difficult for him, negotiating a frustrating Workers' Compensation progress.  He has been having miscellaneous and extensive Workers' Compensation, legal, social, and financial problems, including serious behavior problems of his daughter which have now straightened out.  He states that he has had some depressed moods on and off and six months or so ago, he felt rather hopeless for a short period of time and was given Nortriptyline at a small dose.  At that time, he was losing weight but this problem has now improved and he is much less depressed and more hopeful.  His sleep is better, his weight has stabilized, and he is not suicidal.  He denies substance abuse.  He denies hearing voices or having other psychotic manifestations.  He has not seen a psychiatrist or other mental health worker and has never been psychiatrically hospitalized.  There has been no medication treatment for depression other than a small dose of Nortriptyline or Amitriptyline, presumably for pain control or sleep.

16   As to daily activities, plaintiff reported the following to Dr. Daigle:

17   
18   
19   
20   
21   
22   

> He currently lives at home with his wife and his children are on their own.  He has a valid driver's license.  He drives a motor vehicle without particular problems.  He uses the bus if necessary.  He goes out alone without any reported difficulty.  He takes care of his own self-care.  He helps around the house within his physical limitations, including cleaning, chores, cooking, yard work, errands, and laundry.  He handles the bills and money.  He enjoys spending time with his grandchildren.  He goes to church off and on and is close to church members and the local pastor.  He tries to exercise everyday, he watches his grandchildren, and does light housework on a daily basis.

23   On mental status examination, Dr. Daigle was unable to render any psychiatric diagnosis due to

24   lack of objective findings.  He assigned a GAF score of 70.

25   / / /

26   / / /

12

1    September 1, 2006 – Agency consultative doctor D.W. Pong, M.D., submitted a

2 physical residual functional capacity assessment form.  Dr. Pong opined that plaintiff can

3 occasionally lift/carry 20 pounds and frequently lift/carry 10 pounds.  Plaintiff can sit/stand/walk

4 six hours in an eight-hour day.  Plaintiff's ability to push/pull is unlimited.  The doctor indicated

5 that plaintiff could occasionally perform all postural activities.  No manipulative, visual

6 communicative, or environmental limitations were noted.  As to objective evidence of record

7 supporting these opinions, Dr. Pong stated:

8
     At CE no evid. of myelopathy or radiculopathy.  SLR-lumbar ROM not
     much diminished.  Strength 5/5.  No foot drop.  Gait stable.  Although L
9     spine MRI shows advanced DDD of L5-S1, there is no central stenosis or
     nerve root impingement.

10

11    November 14, 2007 – Benjamin Remington, M.D., submitted a report following a

12 neurological examination of plaintiff.  The doctor noted the following background:

13
     The low back pain is described as a constant stabbing pain.  He has
     shooting pain from his hip down posterolaterally into the big toes.  He has
14     bilateral big toe soreness.  He has constant paresthesias in the bilateral
     lower extremities.

15
     Activities makes the pain worse.  Walking requires breaks but he is able to
16     walk fairly far.  Laying on his side improves the pain.

17
     Chiropractic treatments helped at the beginning.  Physical therapy helped
     to a point.  He had epidural steroid injections x2 and at most he got one
18     month of relief with one of the shots.

19 Dr. Remington reported that, at the time, plaintiff was taking Vicodin, Flexeril, Amitriptyline,

20 and Simvastatin.  On physical examination, the doctor observed that plaintiff's range of motion

21 was good and that his back was non-tender to palpation.  Strength was 5/5 in the lower

22 extremities.  Straight leg raising was negative bilaterally.  Dr. Remington offered the following

23 assessment:

24
     . . . He did suffer a work comp injury and has an MRI that does show some
     obvious source of his pain.  There is severe degenerative disc disease at
25     L5-S1 and moderate degenerative disc disease at L4-5.  I do think that he
     is a surgical candidate as he has had this for many years and has had
26     multiple conservative therapies. . . .

1    Dr. Remington proposed performing an anterior lumbar fusion.

2           January 8, 2008 – Plaintiff underwent an anterior lumbar interbody fusion

3    performed by Dr. Remington.

4           May 7, 2008 – Plaintiff testified at the administrative hearing.  As to the time

5    between the work accident in July 2002 and the fusion surgery in January 2008, plaintiff stated

6    that his pain was constant and located in the hip and extended "all the way down to the feet, to

7    the toes."  Plaintiff stated that, during this time, he could only walk 40 or 50 feet before having to

8    stop and sit down due to fatigue and leg cramping.  Plaintiff stated that he used a cane "in the

9    beginning."  Plaintiff testified that he could not stand very long before he would have to change

10   positions.  As to sitting, plaintiff stated that he could only sit for a few minutes at a time.  He

11   stated that he could lift up to 20 pounds.  Plaintiff testified that, at times during this period, his

12   feet were so swollen he could not wear shoes.  He testified that, by October 2004, he had lost

13   both big toenails and could not drive.  He stated that he was unable to perform work as a home

14   inspector due to lack of balance.

15

16                              **III.  STANDARD OF REVIEW**

17          The court reviews the Commissioner's final decision to determine whether it is:

18   (1) based on proper legal standards; and (2) supported by substantial evidence in the record as a

19   whole.  See Tackett v. Apfel, 180 F.3d 1094, 1097 (9th Cir. 1999).  "Substantial evidence" is

20   more than a mere scintilla, but less than a preponderance.  See Saelee v. Chater, 94 F.3d 520, 521

21   (9th Cir. 1996).  It is ". . . such evidence as a reasonable mind might accept as adequate to

22   support a conclusion."  Richardson v. Perales, 402 U.S. 389, 402 (1971).  The record as a whole,

23   including both the evidence that supports and detracts from the Commissioner's conclusion, must

24   be considered and weighed.  See Howard v. Heckler, 782 F.2d 1484, 1487 (9th Cir. 1986); Jones

25   v. Heckler, 760 F.2d 993, 995 (9th Cir. 1985).  The court may not affirm the Commissioner's

26   decision simply by isolating a specific quantum of supporting evidence.  See Hammock v.

                                             14

1   Bowen, 879 F.2d 498, 501 (9th Cir. 1989).  If substantial evidence supports the administrative

2   findings, or if there is conflicting evidence supporting a particular finding, the finding of the

3   Commissioner is conclusive.  See Sprague v. Bowen, 812 F.2d 1226, 1229-30 (9th Cir. 1987).

4   Therefore, where the evidence is susceptible to more than one rational interpretation, one of

5   which supports the Commissioner's decision, the decision must be affirmed, see Thomas v.

6   Barnhart, 278 F.3d 947, 954 (9th Cir. 2002), and may be set aside only if an improper legal

7   standard was applied in weighing the evidence, see Burkhart v. Bowen, 856 F.2d 1335, 1338 (9th

8   Cir. 1988).

9

10                                    **IV.  DISCUSSION**

11            In his motion for summary judgment, plaintiff argues: (1) in evaluating the

12  medical opinions, the ALJ failed to consider the entire record and provide sufficient reasoning

13  where opinions were not accepted; (2) the ALJ failed to provide sufficient reasoning to reject

14  plaintiff's testimony as not credible; (3) the ALJ ignored lay witness evidence from plaintiff's

15  wife; (4) the ALJ failed to properly evaluate non-physician medical source evidence from

16  plaintiff's treating chiropractor; and (5) the ALJ erred by relying on vocational expert testimony

17  that was not based on an accurate description of plaintiff's residual functional capacity.

18        A.       **Evaluation of Medical Opinions**

19            The weight given to medical opinions depends in part on whether they are

20  proffered by treating, examining, or non-examining professionals.  See Lester v. Chater, 81 F.3d

21  821, 830-31 (9th Cir. 1995).  Ordinarily, more weight is given to the opinion of a treating

22  professional, who has a greater opportunity to know and observe the patient as an individual,

23  than the opinion of a non-treating professional.  See id.; Smolen v. Chater, 80 F.3d 1273, 1285

24  (9th Cir. 1996); Winans v. Bowen, 853 F.2d 643, 647 (9th Cir. 1987).  The least weight is given

25  to the opinion of a non-examining professional.  See Pitzer v. Sullivan, 908 F.2d 502, 506 & n.4

26  (9th Cir. 1990).

1    In addition to considering its source, to evaluate whether the Commissioner

2    properly rejected a medical opinion the court considers whether:  (1) contradictory opinions are

3    in the record; and (2) clinical findings support the opinions.  The Commissioner may reject an

4    uncontradicted opinion of a treating or examining medical professional only for "clear and

5    convincing" reasons supported by substantial evidence in the record.  See Lester, 81 F.3d at 831.

6    While a treating professional's opinion generally is accorded superior weight, if it is contradicted

7    by an examining professional's opinion which is supported by different independent clinical

8    findings, the Commissioner may resolve the conflict.  See Andrews v. Shalala, 53 F.3d 1035,

9    1041 (9th Cir. 1995).  A contradicted opinion of a treating or examining professional may be

10   rejected only for "specific and legitimate" reasons supported by substantial evidence.  See Lester,

11   81 F.3d at 830.  This test is met if the Commissioner sets out a detailed and thorough summary of

12   the facts and conflicting clinical evidence, states her interpretation of the evidence, and makes a

13   finding.  See Magallanes v. Bowen, 881 F.2d 747, 751-55 (9th Cir. 1989).  Absent specific and

14   legitimate reasons, the Commissioner must defer to the opinion of a treating or examining

15   professional.  See Lester, 81 F.3d at 830-31.  The opinion of a non-examining professional,

16   without other evidence, is insufficient to reject the opinion of a treating or examining

17   professional.  See id. at 831.  In any event, the Commissioner need not give weight to any

18   conclusory opinion supported by minimal clinical findings.  See Meanel v. Apfel, 172 F.3d 1111,

19   1113 (9th Cir. 1999) (rejecting treating physician's conclusory, minimally supported opinion);

20   see also Magallanes, 881 F.2d at 751.

21   Plaintiff argues:

22       In short, the ALJ failed to reference Dr. Erasmus's opinion
         regarding Mr. Martin's MRI and need for surgery; failed to reference Dr.
23       Steiner's opinions regarding Mr. Martin's work related limitations; failed
         to reference Mr. Martin's [2008 fusion] surgery; and failed to reference
24       Dr. Remington's surgical reports without articulating legitimate reasons
         for doing so. . . .

25

26   ///

1    Plaintiff also argues that the ALJ failed to consider all of Dr. Karan's opinions.  According to

2    plaintiff, the ALJ's selective discussion of only parts of the various doctors' opinions resulted in

3    a tacit rejection of Dr. Steiner's opinions.

4           A review of the hearing decision reflects that the ALJ set forth detailed

5    discussions as to the opinions of Drs. Karan, Erasmus, Brown, and McIntire regarding plaintiff's

6    musculoskeletal complaints.  As to Dr. Karan, the ALJ noted the doctor's November 12, 2002,

7    report in which the doctor recommended conservative treatment but expressed no opinions

8    regarding functional limitations given the lack at that time of diagnostic studies.  Similarly, the

9    ALJ noted Dr. Erasmus' July 2005 and March 2006 reports, neither of which contains any kind

10   of opinion as to functional limitations.  As to Dr. Erasmus' September 2005 follow-up letter,

11   which plaintiff argues the ALJ failed to consider, the court finds no error because that report also

12   contained no opinions as to functional limitations.  The ALJ did not err with respect to

13   consideration of these doctors' reports because these doctors did not render any opinions as to

14   plaintiff's functional capabilities.

15          It appears that plaintiff is correct in pointing out that the hearing decision is

16   devoid of any discussion of Dr. Steiner's April 2004 report in which the doctor opined that, while

17   plaintiff could no longer perform "substantial work," plaintiff  could stand/walk four hours in an

18   eight-hour day and sit for four to six hours in an eight-hour day.  Here, the ALJ concluded that

19   plaintiff has the residual functional capacity to perform light work.  Dr. Steiner's opinion is

20   consistent with this finding in that an inability to perform "substantial work" does not necessarily

21   preclude light work.  Because the ALJ did not reject Dr. Steiner's opinion, it was not necessary

22   for the ALJ to include a discussion of this doctor's opinion.  In other words, the ALJ need not set

23   forth reasons for accepting a particular medical opinion which is not contradicted.

24          Finally, plaintiff contends that the ALJ erred in failing to reference the fusion

25   surgery performed by Dr. Remington.  As with Dr. Steiner, Dr. Remington did not express any

26   opinions as to plaintiff's functional capacity.

17

1    Plaintiff's argument appears to stem from the notion that the ALJ is required to

2  discuss all of the medical records in a particular case.  This is not so.  Rather, the ALJ is required

3  to provide reasons for rejecting a medical opinion as to functional capacity in favor of another

4  contradictory opinion.  While all evidence must be considered, not all evidence must be

5  discussed in detail in the administrative decision.  Here, there was no need for the ALJ to include

6  detailed discussions of the reports provided by Drs. Karan, Erasmus, Steiner or Remington

7  because none of these doctors expressed any opinion as to plaintiff's functional abilities.

8    **B.    Plaintiff's Credibility**

9    The Commissioner determines whether a disability applicant is credible, and the

10  court defers to the Commissioner's discretion if the Commissioner used the proper process and

11  provided proper reasons.  See Saelee v. Chater, 94 F.3d 520, 522 (9th Cir. 1996).  An explicit

12  credibility finding must be supported by specific, cogent reasons.  See Rashad v. Sullivan, 903

13  F.2d 1229, 1231 (9th Cir. 1990).  General findings are insufficient.  See Lester v. Chater, 81 F.3d

14  821, 834 (9th Cir. 1995).  Rather, the Commissioner must identify what testimony is not credible

15  and what evidence undermines the testimony.  See id.  Moreover, unless there is affirmative

16  evidence in the record of malingering, the Commissioner's reasons for rejecting testimony as not

17  credible must be "clear and convincing."  See id.; see also Carmickle v. Commissioner, 533 F.3d

18  1155, 1160 (9th Cir. 2008) (citing Lingenfelter v Astrue, 504 F.3d 1028, 1936 (9th Cir. 2007),

19  and Gregor v. Barnhart, 464 F.3d 968, 972 (9th Cir. 2006)).

20    If there is objective medical evidence of an underlying impairment, the

21  Commissioner may not discredit a claimant's testimony as to the severity of symptoms merely

22  because they are unsupported by objective medical evidence.  See Bunnell v. Sullivan, 947 F.2d

23  341, 347-48 (9th Cir. 1991) (en banc).  As the Ninth Circuit explained in Smolen v. Chater:

24    The claimant need not produce objective medical evidence of the
       [symptom] itself, or the severity thereof.  Nor must the claimant produce
25    objective medical evidence of the causal relationship between the
       medically determinable impairment and the symptom.  By requiring that
26    the medical impairment "could reasonably be expected to produce" pain or

18

another symptom, the <u>Cotton</u> test requires only that the causal relationship
be a reasonable inference, not a medically proven phenomenon.

80 F.3d 1273, 1282 (9th Cir. 1996) (referring to the test established in
<u>Cotton v. Bowen</u>, 799 F.2d 1403 (9th Cir. 1986)).

The Commissioner may, however, consider the nature of the symptoms alleged,
including aggravating factors, medication, treatment, and functional restrictions.  <u>See</u> <u>Bunnell</u>,
947 F.2d at 345-47.  In weighing credibility, the Commissioner may also consider: (1) the
claimant's reputation for truthfulness, prior inconsistent statements, or other inconsistent
testimony; (2) unexplained or inadequately explained failure to seek treatment or to follow a
prescribed course of treatment; (3) the claimant's daily activities; (4) work records; and (5)
physician and third-party testimony about the nature, severity, and effect of symptoms.  <u>See</u>
<u>Smolen</u>, 80 F.3d at 1284 (citations omitted).  It is also appropriate to consider whether the
claimant cooperated during physical examinations or provided conflicting statements concerning
drug and/or alcohol use.  <u>See</u> <u>Thomas v. Barnhart</u>, 278 F.3d 947, 958-59 (9th Cir. 2002).  If the
claimant testifies as to symptoms greater than would normally be produced by a given
impairment, the ALJ may disbelieve that testimony provided specific findings are made.  <u>See</u>
<u>Carmickle</u>, 533 F.3d at 1161 (citing <u>Swenson v. Sullivan</u>, 876 F.2d 683, 687 (9th Cir. 1989)).

As to plaintiff's credibility, the ALJ stated:

In determining the claimant's residual functional capacity. . . I also
considered the allegations of his symptoms and functional limitations. . . .

However, to the extent that it is alleged that the claimant could not
perform work at the residual functional capacity as recited above, during
the period at issue, the Administrative Law Judge finds those allegations
are not totally credible for the following clear and convincing reasons.

**First**, the claimant's activities of daily living include, independently caring
for all of this own personal hygiene; he assists around the house with
cleaning, chores, cooking, yard work, errands, and laundry; he handles the
bills and money; he drives a vehicle and uses the bus if necessary; attends
church off and on; exercises daily; and watches his grandchildren (exhibit
14F).  These activities do not indicate a disabling level of impairment of
the claimant's residual functional capacity.

/ / /

19

**Second**, it was noted during the August 17, 2006, consultative psychiatric evaluation by Dr. Daigle that the claimant's complaints predominately consisted of physical problems limiting his employment and not any significant psychiatric problems.  **Third**, during the mental status examination the claimant was coherent and organized; there was no tangentiality or loosening of associations; he was relevant and non-delusional; there was no bizarre or psychotic thought content and he had no suicidal, homicidal, or paranoid ideations; and his mood was euthymic which an effect that was within normal limits with no tearfulness, psychomotor retardation.

**Fourth**, at the November 12, 2002, neurological evaluation by Dr. Karan, it was noted that the claimant had a preserved thoracic kyphosis and only mild straightening of the lumbosacral spine.  **Fifth**, Dr. Karan also noted that the claimant's coordination was normal, his gait, tandem gait, and Romberg were all normal; there was no atrophy, fasciculations, or tremors and muscle bulk and tone were normal for his age and habitum with 5/5 strength in all four extremities.

**Sixth**, it is noted that when the claimant was seen as a new patient at the Central Valley Medical Care center on January 20, 2004, he reported no complaints of any back pain; in fact, there is no mention of any complaints of back pain in any of the subsequent follow-up treatment notes dated February 27, 2004; March 8, 2004; March 26, 2004; or October 1, 2004. Therefore, it doesn't appear as if the claimant has having any problems with regards to his back during this period.

**Seventh**, when the claimant was examined by Dr. Erasmus, on July 27, 2005, the claimant reported that after about six months of chiropractic treatment his back and left leg pain had eased to a significant extent. **Eighth**, on examination Dr. Erasmus noted that the claimant walked with a reasonably satisfactory gait and he was able to heel and toe walk with only a slight weakness of dorsiflexion of the right foot involving the extensor hallucis.

**Ninth**, at the August 5, 2006, consultative neurological evaluation by Dr. McIntire, the doctor noted during physical examination that the claimant had not gross instability of gait, he was able to walk on his heels and toes without foot drop, he was able to tandem walk and Romberg's test was negative.  **Tenth**, impressions from the October 17, 2007, MRI included a benign old L5 compression fracture; a mild annular bulging of the L4-5 and L5-S1 discs with mild foraminal narrowing and global disc desiccation.

**Eleventh**, when discussing the claimant's impairments, no physician, neither any of the claimant's treating physicians or a State Agency physician ever opined that listing level limitations were ever met or equaled.  **Twelfth**, the objective evidence of the claimant's medical record does not establish impairments likely to produce disabling pain or other limitations as alleged for any period of 12 or more continuous months.

> After considering the evidence of record, I find that the claimant's
> medically determinable impairments could have been reasonably expected
> to produce some of the alleged symptoms but that the claimant's
> statements concerning the intensity, persistence, and limiting effects of
> these symptoms are not entirely credible.

Plaintiff argues that, in making his adverse credibility findings, the ALJ: (1) mischaracterized plaintiff's daily activities; (2) discounted evidence of plaintiff's mental impairment; (3) selectively discussed the reports of Drs. Karan and Erasmus; and (4) improperly relied on lack of complaints of back pain when plaintiff was seen at Central Valley Medical Center.

A review of the record reflects that the ALJ's adverse credibility finding was justified. As of November 14, 2003, Dr. Brown opined that plaintiff could perform work as a home inspector/contractor. This contradicts plaintiff's testimony of disabling symptoms. Plaintiff's subjective testimony of disabling pain and other symptoms is further contradicted by Dr. Erasmus' report in July 2005 that, after six months of care with Dr. Brown, plaintiff felt his pain had "eased to a significant extent." Plaintiff stated on his April 2006 application for benefits that he required the use of an assistive device. But, when he appeared for an examination performed by Dr. McIntire in August 2006 he used no such device and was able to move about the examination room, though with some stiffness. Similarly, plaintiff told Dr. Daigle in August 2006 that he goes out alone without any reported difficulty but, in his April 2006 application, plaintiff stated that he could not go out alone because his legs could give out at any time. Furthermore, as noted by the ALJ, plaintiff's subjective complaints are out of proportion to the objective evidence of record which establishes, as most, impairments precluding only work above the light exertional level.

## C.   Lay Witness Evidence

In determining whether a claimant is disabled, an ALJ generally must consider lay witness testimony concerning a claimant's ability to work. See Dodrill v. Shalala, 12 F.3d 915, 919 (9th Cir. 1993); 20 C.F.R. §§ 404.1513(d)(4) & (e), 416.913(d)(4) & (e). Indeed, "lay testimony as to a claimant's symptoms or how an impairment affects ability to work is competent

1  evidence . . . and therefore cannot be disregarded without comment." See Nguyen v. Chater, 100

2  F.3d 1462, 1467 (9th Cir. 1996).  Consequently, "[i]f the ALJ wishes to discount the testimony

3  of lay witnesses, he must give reasons that are germane to each witness." Dodrill, 12 F.3d at

4  919.

5          The ALJ, however, need not discuss all evidence presented.  See Vincent on

6  Behalf of Vincent v. Heckler, 739 F.2d 1393, 1394-95 (9th Cir. 1984).  Rather, he must explain

7  why "significant probative evidence has been rejected." Id. (citing Cotter v. Harris, 642 F.2d 700,

8  706 (3d Cir.1981).  Applying this standard, the court held that the ALJ properly ignored evidence

9  which was neither significant nor probative.  See id. at 1395.  As to a letter from a treating

10 psychiatrist, the court reasoned that, because the ALJ must explain why he rejected

11 uncontroverted medical evidence, the ALJ did not err in ignoring the doctor's letter which was

12 controverted by other medical evidence considered in the decision.  See id.  As to lay witness

13 testimony concerning the plaintiff's mental functioning as a result of a second stroke, the court

14 concluded that the evidence was properly ignored because it "conflicted with the available

15 medical evidence" assessing the plaintiff's mental capacity.  Id.

16          In Stout v. Commissioner, the Ninth Circuit recently considered an ALJ's silent

17 disregard of lay witness testimony.  See 454 F.3d 1050, 1053-54 (9th Cir. 2006).  The lay witness

18 had testified about the plaintiff's "inability to deal with the demands of work" due to alleged

19 back pain and mental impairments.  Id.  The witnesses, who were former co-workers testified

20 about the plaintiff's frustration with simple tasks and uncommon need for supervision.  See id.

21 Noting that the lay witness testimony in question was "consistent with medical evidence," the

22 court in Stout concluded that the "ALJ was required to consider and comment upon the

23 uncontradicted lay testimony, as it concerned how Stout's impairments impact his ability to

24 work." Id. at 1053.   The Commissioner conceded that the ALJ's silent disregard of the lay

25 testimony contravened Ninth Circuit case law and the controlling regulations, and the Ninth

26 Circuit rejected the Commissioner's request that the error be disregarded as harmless.  See id. at

1   1054-55.  The court concluded:

2       Because the ALJ failed to provide any reasons for rejecting competent lay
        testimony, and because we conclude that error was not harmless,
3       substantial evidence does not support the Commissioner's decision . . .

4       Id. at 1056-67.

5           From this case law, the court concludes that the rule for lay witness testimony

6   depends on whether the testimony in question is controverted or consistent with the medical

7   evidence.  If it is controverted, then the ALJ does not err by ignoring it.  See Vincent, 739 F.2d at

8   1395.  If lay witness testimony is consistent with the medical evidence, then the ALJ must

9   consider and comment upon it.  See Stout, 454 F.3d at 1053.  However, the Commissioner's

10  regulations require the ALJ consider lay witness testimony in certain types of cases.  See Smolen

11  v. Chater, 80 F.3d 1273, 1288 (9th Cir. 1996); SSR 88-13.  That ruling requires the ALJ to

12  consider third-party lay witness evidence where the plaintiff alleges pain or other symptoms that

13  are not shown by the medical evidence.  See id.  Thus, in cases where the plaintiff alleges

14  impairments, such as chronic fatigue or pain (which by their very nature do not always produce

15  clinical medical evidence), it is impossible for the court to conclude that lay witness evidence

16  concerning the plaintiff's abilities is necessarily controverted such that it may be properly

17  ignored.  Therefore, in these types of cases, the ALJ is required by the regulations and case law to

18  consider lay witness evidence.

19          Plaintiff argues: "In the case at bar, the ALJ failed to even reference Mrs. Martin's

20  credible third party statements . . ., much less provide specific and germane reasons for

21  disregarding this evidence."  The court agrees with defendant that there was no error because

22  Mrs. Martin's testimony is controverted by the medical opinion evidence.  See See Vincent, 739

23  F.2d at 1395.  A few examples suffice to illustrate the point.  For instance, Mrs. Martin stated

24  that plaintiff has problems with his feet which require him to wear special shoes and that plaintiff

25  requires the use of an assistive device to move about.  In August 2005, however, Dr. McIntire

26  observed that plaintiff was in no acute distress and did not use any assistive device.  By way of

23

1   further example, Mrs. Martin stated that plaintiff is unable to bend over or stand/walk for more

2   than 15 minutes due to increasing pain and that plaintiff can only walk for 20 feet before needing

3   to rest.   In April 2004, however, Dr. Steiner opined that plaintiff could stand/walk four hours in

4   an eight-hour day, and sit four to six hours in an eight-hour day.  Given the contradictory medical

5   opinion evidence, Mrs. Martin's statements were not probative and no error occurred in ignoring

6   them.

7            D.      **Non-Physician Medical Source Evidence**

8            Citing 20 C.F.R. § 404.1513(e), plaintiff argues that the ALJ failed to "even

9   reference Dr. Brown's statements, observations, and opinions regarding the impact of Mr.

10  Martin's impairments on his ability to work."  At the outset, the court observes that, contrary to

11  plaintiff's contention, the ALJ did in fact reference Dr. Brown's records at pages 12-13 of the

12  hearing decision.  In any event, the court agrees with defendant that the ALJ did not improperly

13  reject any opinions expressed by Dr. Brown as to plaintiff's functional limitations because no

14  such opinions were expressed by the doctor.  A sampling of Dr. Brown's treatment notes reflects

15  this fact.  At the July 2002 initial consultation, Dr. Brown diagnosed lumbar strain but expressed

16  no opinion as to plaintiff's level of functioning.  Similarly, in a November 2002 follow-up

17  progress note, Dr. Brown states that plaintiff is disabled, but notes no objective findings to

18  support the conclusion.  No functional assessment was expressed by the doctor.[3]  Likewise, in

19  progress notes dates November 25, 2002, March 5, 2003, July 11, 2003, November 14, 2003,

20  February 23, 2005, March 25, 2005, and January 31, 2006, Dr. Brown makes no mention of any

21  specific functional limitations related to objective clinical findings.

22  / / /

23

24          [3]      Dr. Brown's various statements that plaintiff is disabled does not reflect a
    functional assessment as to specific exertional areas.  Rather, such statements represent the
    doctor's view on the ultimate issue of disability, which determination lies solely with the
25  Commissioner.  It is also noted that Dr. Brown's statements as to disability were largely made in
    the context of plaintiff's worker's compensation claim and not in the context of his social
26  security application.

## E.   **Vocational Expert Testimony**

Hypothetical questions posed to a vocational expert must set out all the substantial, supported limitations and restrictions of the particular claimant.  See Magallanes v. Bowen, 881 F.2d 747, 756 (9th Cir. 1989).  If a hypothetical does not reflect all the claimant's limitations, the expert's testimony as to jobs in the national economy the claimant can perform has no evidentiary value.  See DeLorme v. Sullivan, 924 F.2d 841, 850 (9th Cir. 1991).  While the ALJ may pose to the expert a range of hypothetical questions based on alternate interpretations of the evidence, the hypothetical that ultimately serves as the basis for the ALJ's determination must be supported by substantial evidence in the record as a whole.  See Embrey v. Bowen, 849 F.2d 418, 422-23 (9th Cir. 1988).

Regarding the vocational expert's testimony, the ALJ stated:

If the claimant had the residual functional capacity to perform the full range of light work, a finding of "not disabled" would be directed by Medical-Vocational Rule 202.21.  However, the claimant's ability to perform all or substantially all of the requirements of this level of work has been impeded by additional limitations.  To determine the extent to which these limitations erode the unskilled light occupational base, the Administrative Law Judge asked the vocational expert whether jobs exist in the national economy for an individual with the claimant's age, education, work experience, and residual functional capacity.

The vocational expert testified that, given all of these factors, the individual would be able to perform the requirements of representative occupations such as a retail salesperson . . ., a security guard. . ., or as a route driver.  Mr. Reed [the vocational expert] reported that there were approximately 1,339 retail salesperson jobs, 624 unskilled security guard jobs, 3,929 semi-skilled security guard jobs, 636 unskilled route driver jobs, and 1,485 semi-skilled route driver jobs in the Sacramento regional economy.  He also testified that there were approximately 23,424 retail salesperson jobs, 11,509 unskilled security guard jobs, 72,507 semi-skilled security guard jobs, 11,148 unskilled route driver jobs, and 26,013 semi-skilled route driver jobs in the California state economy.  Lastly, Mr. Reed testified that there were approximately 195,620 retail salesperson jobs, 84,560 unskilled security guard jobs, 532,727 semi-skilled security guard jobs, 106,218 unskilled route driver jobs, and 247,842 semi-skilled route driver jobs in the national economy.

Pursuant to SSR 00-4p, the vocational expert further testified his job classifications were consistent with those in the Dictionary of Occupational Titles.

1
2
3

> Based on the testimony of the vocational expert, I conclude that, considering the claimant's age, education, work experience, and residual functional capacity, the claimant has been capable of making a successful adjustment to other work that exists in significant numbers in the national economy. . . .

4   Plaintiff argues that the ALJ relied on the vocational expert's response to a hypothetical which

5   did not accurately describe plaintiff.  Plaintiff also argues that the vocational expert's testimony

6   as to one particular job conflicted with the Dictionary of Occupational Titles ("DOT") and that

7   the ALJ failed to inquire of the vocational expert as to such conflict.

8           Turning to plaintiff's first argument, the court finds for the reasons discussed

9   above that the ALJ's hypothetical accurately described plaintiff's functional capacity.

10  Specifically, the ALJ asked about a hypothetical individual who would perform light work with a

11  limitation to only occasional stooping, squatting, kneeling, crawling, and climbing, and no tasks

12  involving the use of foot controls.  Greater limitations are not supported by the record.

13          As to plaintiff's argument concerning a conflict with the DOT as to one job

14  suggested by the vocational expert, the court agrees with defendant that any error is

15  inconsequential because the vocational expert listed other jobs plaintiff could perform and as to

16  which there is no conflict.

17  / / /

18  / / /

19  / / /

20  / / /

21  / / /

22  / / /

23  / / /

24  / / /

25  / / /

26  / / /

1

## V.  CONCLUSION

        Based on the foregoing, the court concludes that the Commissioner's final decision is based on substantial evidence and proper legal analysis.  Accordingly, IT IS HEREBY ORDERED that:

        1.      Plaintiff's motion for summary judgment (Doc. 21) is denied;

        2.      Defendant's cross-motion for summary judgment (Doc. 24) is granted; and

        3.      The Clerk of the Court is directed to enter judgment and close this file.


 DATED: September 27, 2010

                                                    _____
                                                    **CRAIG M. KELLISON**
                                                    UNITED STATES MAGISTRATE JUDGE